## Society of the Cincinnati's Appeal.

*Trusts—Washington monument—Society of the Cincinnati.*

Where a fund was started in 1810 to erect " a monument in the city of Philadelphia " to the memory of Washington, the site of the monument need not be within the corporate limits of the city of Philadelphia as they were in 1810. Soohan v. Phila., 33 Pa. 9, distinguished.

*Equity—Trusts and trustees—Powers of trustees—Washington Monument Fund—Appeal.*

At a public meeting held in 1824, at Philadelphia, a resolution was passed to erect a monument to the memory of Washington in that city. A committee was appointed to carry into effect the resolution. They were authorized " to fill any vacancies that may occur in their body," to collect subscriptions, to receive designs, select the place most suitable, and adopt prompt measures for the execution of the project. By other resolutions it appeared that it was the expectation of the meeting and subscribers that the monument should be placed in Washington Square, and that the fund should be united with that of the Society of the Cincinnati, but nothing was made mandatory upon the committee. A fund was raised, but the committee never selected a site or turned the money over to the Society of the Cincinnati. After the death of all the members of the committee, a trust company was appointed trustee of the fund. In 1880, the Society of the Cincinnati presented a petition to the court, praying that the fund should be handed over to them. The trust company made no objection to its own discharge as trustee, and the decree was entered, awarding the fund to the Society of the Cincinnati for the erection of a monument " upon a suitable spot in the Park of the city of Philadelphia." The Society of

the Cincinnati subsequently changed the proposed cite to Independence Square, and the city granted its consent to the erection of the monument in that square. The Society of the Cincinnati then presented a petition, praying that the decree of 1880 should be modified so as to permit the erection of the monument in Independence Square. *Held :*

1. That the Society of the Cincinnati, as trustee, had all the powers of the original committee, and had authority to select any site within the city of Philadelphia.

2. That so much of the decree of 1880 as interfered with the free exercise of their discretion and assumed to fix the site was improvidently made, and should be rescinded.

3. That an appeal would lie from the order refusing to modify the decree.

*Independence Square—Act of March 11, 1816—Buildings—Monument.*

The erection of a monument consisting of a statue upon a pedestal does not violate the act of March 11th, 1816, authorizing the sale of the square to the city of Philadelphia, and providing that " no part of said ground, lying in the southward of the state house within the wall as it is now built, be made use of for erecting any sort of buildings thereon, but that the same shall be and remain a public green and walk forever."

Argued March 31, 1893.    Appeal, No. 315, Jan. T., 1893, by the State Society of the Cincinnati of Pennsylvania, from decree of C. P. No. 1, Phila. Co., March T., 1880, No. 357, refusing to modify decree previously entered. Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL and DEAN, JJ.

Petition for modification of decree.

The petition of the Society of the Cincinnati averred:

" On the thirtieth day of April, 1880, your petitioners presented their petition to your honorable court, setting forth, inter alia, that there had been then collected and in the hands of the petitioners, the sum of one hundred and thirty-seven thousand dollars, more or less, for the purpose of the erection of a monument in memory of General George Washington ; that a fund amounting to the sum of about fifty thousand dollars, and which had been raised and collected for a similar purpose, was in the possession of the Pennsylvania Company for Insurance on Lives and Granting Annuities, trustees, and your petitioners then prayed, that as the object of the subscribers to the said two funds was the same, it might be carried out by uniting the two funds in the hands of the petitioners so as to enable them to erect one grand monument with the said united

fund, rather than by a division of the same to multiply the monuments at the sacrifice of dignity and beauty. And on the coming in of the answer of the said The Pennsylvania Company for Insurance on Lives and Granting Annuities, trustees, your honorable court, after considering the testimony taken in support of the petition, upon the 19th day of June, 1880, entered the following decree:

"'And now, this 19th day of June, 1880, this cause coming on to be heard upon petition, answer and report of the examiner, it is ordered, adjudged and decreed, the respondents, The Pennsylvania Company for Insurance on Lives and Granting Annuities, by their answer assenting to their discharge, that the said respondents be discharged as trustees for said fund; that the petitioners, the State Society of the Cincinnati of Pennsylvania, be appointed trustees in their place, and that security be entered by the said newly appointed trustees in the sum of sixty thousand dollars to be approved by the court for the faithful performance of their duties, and that upon the payment and delivery to the said successors of the said company, of the cash, securities and other assets in their hands, the said respondents shall be discharged from all further liability and accountability therefor; and it further appearing to the court from the proof taken that it was the intention of the party holding and representing the funds of the said Washington Monument Fund, that the same should be united to the funds of the State Society of the Cincinnati of Pennsylvania, and together applied to the erection of one grand monument in honor of General Washington, and the court having verified, through its examiner, the funds and securities in the hands of the State Society of the Cincinnati, held by the said society for the purpose of being so applied, and found that the same amount to the sum of one hundred and thirty-seven thousand five hundred and forty-one dollars, being rather more than the sum stated in the petition of the said society, and no objection being made to the proposed union of the fund, it is further ordered, adjudged and decreed that the moneys and securities belonging to the fund known as the Washington Monument Fund, be applied by the State Society of the Cincinnati of Pennsylvania in conjunction with the funds now in their own hands as aforesaid, to the purpose of the construction and erec-

tion of a monument upon a suitable spot in the park of the city of Philadelphia in honor of the memory of Gen. George Washington, the said construction to be made under the direction of the State Society of the Cincinnati of Pennsylvania.'

" Subsequently, on the 1st day of July, 1880, the said decree was modified as follows :

" ' That the order for the entering of security in the sum of sixty thousand dollars, to be approved by the court, by the said State Society of the Cincinnati, the newly appointed trustees, be rescinded, and in lieu of security to be entered by the said society, the cash, securities and other assets directed to be paid and transferred to said society by the old trustees, the Pennsylvania Company for Insurance on Lives and Granting Annuities, who were discharged from their trust on transfer of said securities, etc., be retained by the said company under the direction of this court, and that leave be given to the said State Society of the Cincinnati to apply from time to time to this court, during the progress and erection of the said monument for the payment and delivery to them of so much cash and securities as may be needed in the prosecution of the said work, until the whole amount be paid out and delivered.'

" Subsequently from time to time, sur petitions duly presented to your honorable court, decrees were entered directing the expenditure of the fund originally known as the Washington Monument Fund, until at the present time the entire fund has been expended in the preparation of the monument. As appears by the decrees aforesaid and by the petition upon which the said decrees were founded, it was proposed in 1880 that the monument should be erected in the park of the city of Philadelphia, if a suitable site could be obtained. Since which date, after many thorough investigations, the committee of your petitioners, to whom was intrusted the final selection of a site, reported that in their judgment the Fairmount park of the city of Philadelphia did not contain a location suitable for the erection of such a monument.

" And further it appears among the records of the State Society of the Cincinnati of Pennsylvania, published by order of the society for the use of its members, 1891, page 86, taken from the original records of the society, ' Pursuant to public notice the society met in the state house in Philadelphia on

Wednesday, the 4th day of July, 1810, at 10 A. M.    On motion of Charles Biddle, seconded by Major Jackson, the following preamble and resolutions were unanimously adopted:

" ' To establish a permanent memorial of their respect for the memory of the late Father of his Country, General George Washington, by the erection of a monument in the city of Philadelphia, has long been the wish of those who are desirous of perpetuating the recollection of his virtues. . . .

" ' This society resolves, That a committee be appointed to prepare a plan for raising, by subscription, such sums of money as they shall deem sufficient for the purpose of erecting a monument to the memory of General Washington.    That the plan, when prepared, shall be submitted to the standing committee, and when approved by them be carried into effect.

" ' That Major Lenox, Judge Peters, Major Jackson, Mr. Biddle and Mr. Binney be a committee for the above purposes, and that they also be authorized under the direction of the standing committee, when the subscriptions have been completed, to procure a proper site for the monument and have it erected.'

" And further, That it appears from this extract that this fund known as the Washington Monument Fund, raised under authority of this preamble and resolution, and held by your petitioners, was created for the erection of a monument in the city of Philadelphia, and that, by virtue of this authority vested in it, the standing committee are carrying out the expressed intention of the donors of the fund by selecting Independence Square as the site for the erection of the monument of your petitioners.

" And it is clear that the ' park of the city of Philadelphia,' to wit, Fairmount park, now a part of the said city, was at the time of the creation of the said fund, to wit, in the year 1810, not within the limits of the said city, the first acquisition of land therein, known as ' Faire Mount,' being made in 1812 for the purpose of obtaining a supply of water free from impurities, and that the councils of the said city by ordinance, September 15, 1855, ' devoted and dedicated ' the ' Lemon Hill Estate,' purchased by the said city, July 24, 1844, to public use, to be known by the name of Fairmount park.

" On the first day of March, 1892, the councils of the city of

Philadelphia passed an ordinance, which was subsequently approved by the Hon. Edwin S. Stuart, mayor of the said city, as follows:

" 'An ordinance, granting permission to the State Society of the Cincinnati of Pennsylvania, to erect a monument to General Washington in Independence Square.

" 'Section 1. The select and common councils of the city of Philadelphia do ordain, That permission be and is hereby granted to the State Society of the Cincinnati of Pennsylvania to erect in Independence Square a monument to the memory of General Washington; said monument, when erected, to be the property of the city of Philadelphia.

" 'Section 2. The director of the department of public safety is hereby authorized and directed to indicate a suitable spot in Independence Square, on which the monument shall be erected: Provided, The city of Philadelphia shall be under no expense for the erection of the same.'

" Your petitioners, therefore, having received permission by the said ordinance, now intend to erect a monument, to be purchased by the joint funds, in Independence Square, in the city of Philadelphia; and they, therefore, pray that the decree heretofore entered on the 19th day of June, 1880, by your honorable court, shall be modified so far as it contains the words for the erection of a monument in the park of the said city, and that a decree be now entered authorizing your petitioners to expend the Washington Monument Fund in conjunction with the fund held by your petitioners, in the erection of a monument in Independence Square, pursuant to the leave granted by the said councils and the mayor of the city aforesaid."

The court refused the prayer and dismissed the petition in an opinion by BIDDLE, J., 1 Dist. R. 477.

*Errors assigned* were, (1) in not modifying the decree of 1880, as prayed for in the petition; (2) in dismissing the petition of the appellant; (3) in entering an order that the petition of the appellant be dismissed; (7) in not holding that the selection of the site was an unimportant incident to the first decree.

*William W. Porter* and *George W. Biddle, Grant Weidman* and *Wm. MacPherson Hornor* with them, for appellant.—The

monument can be erected only within the original corporate limits of Philadelphia: Soohan v. Phila., 33 Pa. 9.

To attempt to perform the original decree of 1880 would result in a violation of law by the State Society of the Cincinnati, inasmuch as they would be applying one of the funds in their hands as trustees to the erection of a statue in a place where the original creators of that fund did not provide that it should go.

Furthermore the society itself should be the only arbiters as to the selection of the site.   The resolution practically so provides.

The petition to modify the decree was not a mere application to a court of common law to amend its record.   If it were, of course the application would be only to the discretion of the court below, and no appeal would lie.   The application was, however, in substance, in the nature of a bill in equity.   The distinction between the two forms of application is marked with accuracy in the opinion expressed in Kendig's Ap., 82 Pa. 71.

The right to have the erroneous matter contained in the decree removed therefrom was in the petitioners, on the equitable ground of accident.

*John G. Johnson* and *David W. Sellers, J. Willis Martin* with them, for appellee.—An appeal does not lie from the order complained of : Supreme Court Equity, Rules xiv, § 79, xv, § 86 Kendig's Ap., 82 Pa. 68; Cohen v. Scheur, 115 Pa. 178; Pearson's Supreme Court Eq., Rule iii, § 12; Gloninger v. Hazard, 42 Pa. 400 ; Forward School District's Ap., 56 Pa. 318 ; Dick's Ap., 106 Pa. 589; Kalbach v. Fisher, 1 Rawle, 323 ; Gaskill v. Crawford, 130 Pa. 28; Cochran v. Eldridge, 49 Pa. 365 ; McClelland v. Pomeroy, 75 Pa. 410; King v. Brooks, 72 Pa. 363; Kensington, etc., Trunpike Co., 97 Pa. 260.

Appellant having accepted the benefits of the decree is estopped from seeking to change it.

The use of Independence Square as a site for the monument is unlawful, and either the erection thereon would be prevented by injunction, or the monument would be removed by process of law if completed: Act of May 1, 1729 ; Etting's History of Independence Hall, p. 13 ; Lewis' Land Titles in Philadelphia, p. 114; act of March 20, 1735, Hall & Sellers's Laws, 189; act of Feb. 17, 1762.

A monument is a building within the meaning of the act of March 11, 1816 ; Century Dict. 712; Wright v. Evans, 2-Abb. Pr. N. S. 308; act of Aug. 5, 1870; act of March 30, 1870.

To permit the erection of a monument will change the character of the square from " a public green and walk," as required by the condition attached to the title, to a " plaza : " Baird v. Rice, 63 Pa. 489.

The ordinance of councils set out in the petition conferred no rights upon the State Society of the Cincinnati. Councils of the city of Philadelphia do not possess the power to authorize such an erection in the square: Bell v. Ohio, etc., R. R., 1 Grant, Pa. 105; Com. v. Erie R. R., 27 Pa. 339 ; Com. v. Harris, 10 W. N. 10 ; Reimer's Ap., 100 Pa. 182 ; act of March 16, 1847 ; Wartman v. City, 33 Pa. 202 ; Rung v. Shoneberger, 2 Watts, 23 ; Com. v. Bowman, 3 Pa. 202 ; act of Feb. 2, 1853 ; Com. v. Alburger, 1 Whart. 469.

The decree was entirely proper under the cy pres doctrine as adopted in the jurisprudence of this commonwealth : City v. Girard Heirs, 45 Pa. 28.

Soohan v. Phila. 33 Pa. 9, does not apply.

OPINION BY MR. JUSTICE MITCHELL, May 15, 1893 :

This is a petition of trustees to remove an apparent bar to the exercise of their control over the subject-matter which was vested in them at the inception of the trust, and which they claim they have never intentionally surrendered, nor been legally deprived of. It is in effect a bill of review for the restoration of the trust to its true position according to its original terms, from which it has been improvidently if not unintentionally diverted. Such a bill is clearly the subject of appeal.

The first fact to be noted is that there is no one opposing the petition who has any right to a voice in the matter. The First Troop, City Cavalry, and Mr. Schively, in their respective affidavits, set out that they were subscribers in 1832 to a fund for erecting a monument to Gen. George Washington in Washington Square. That fund is not in the present controversy. Even if it were, it is doubtful if they would have any standing, for neither claims to have been member of the committee in charge, or to have had any part in the custody and management of the fund, nor that the location in Washington Square

was an essential condition of the subscription.    But it is suffi-
cient to say that the fund was in no wise connected with the
Cincinnati or with the so-called Monument Fund.    The testi-
mony of Mr. Sartain puts this beyond question.

The Cincinnati fund was started by the appellants, an incor-
porated society, in 1810.    The preamble and resolutions under
which it was raised, set out that it was to establish a permanent
memorial of respect for the memory of Washington by the erec-
tion of a monument in the city of Philadelphia, and a commit-
tee was appointed to prepare a plan, collect subscriptions, and
under the direction of the general standing committee of the
society, " when the subscriptions have been completed, to pro-
cure a proper site for the monument, and have it erected."
The fund is thus shown to have been the property and under the
absolute control and disposition of the Cincinnati society, sub-
ject to no conditions or limitations except that the monument
should be located in the city of Philadelphia.    There is no evi-
dence in the case, nor any claim made, so far as appears, that
this absolute discretion of the Cincinnati over the site of the
monument has been in any way modified up to the present time,
unless by the decree of the court below which is now the sub-
ject of this controversy.    We are not able to concur in the view
advanced, that the site of the monument must be within the
corporate limits of the city of Philadelphia as they were in
1810, nor do we think the decision of this court in Soohan v.
Philadelphia, 33 Pa. 9, has any bearing on this case.    In 1810
the corporate title of this city was " The Mayor, Aldermen,
and Citizens of Philadelphia," and its municipal jurisdiction ex-
tended only from the Delaware to the Schuylkill rivers between
Vine and Cedar or South streets.    The adjacent territory was
formed into boroughs and districts, having separate legal or-
ganization, as is very learnedly and elaborately set out in Soo-
han v. Philadelphia.    The will of Stephen Girard directed the
keeping in repair of his real estate in the " City and Liberties
of Philadelphia; " devoted a large sum to improvement of a pas-
sage or street " on the east part of the city of Philadelphia and
to be called Delaware avenue, *extending from Vine to Cedar
streets ;* " and in other ways indicated distinctions in favor of
the technical corporation.    It was therefore held in Soohan v.
Philadelphia that when he directed the location of the college

for orphans, in the square between Eleventh and Twelfth and Market and Chestnut streets, within the limits of the legal municipality, and provided that orphans born within the city of Philadelphia should have preference in admission, he meant those born within the city, technically so called, as distinguished from the surrounding boroughs and liberties. That decision rests upon the actual intent of Girard as shown by the terms of his will. There is no such ground in this case upon which to rest a similar restriction. It is nowhere indicated in the proceedings, and is opposed to the nature of the undertaking. In 1810 the boundaries between the city proper and some of the adjoining districts had already become mere legal distinctions, not entering into the popular mind. The streets were continuous, and the lines of houses at many points unbroken. In passing down the river bank to the old Swedes church the citizen saw nothing at South street to point out to him that he was leaving the city and entering Southwark which had been a separate corporation since 1762, and if he walked north on Second street there was no gap of vacant land at Vine to tell him he was passing into the northern liberties. The city in its general sense, as defined by Webster, " a large number of houses and inhabitants established in one place," had no relation to the technical limits of the legal corporation. The fund of the Cincinnati was raised by popular subscription, among the members of the society, for a public purpose, and there is no evidence to rebut the presumption that the words descriptive of the site were used in their popular sense, to signify the city of Philadelphia as geographically and popularly understood, the coterminous built-up territory identified in the popular mind as the city, and expanding from time to time in accordance with the enlarged meaning of the term in the minds of the people.

The other fund, which may be called for convenience the Citizens' Monument Fund, is the one which has given rise to the present controversy, and its history and status must therefore be considered. The project for a monument, started in 1810, had languished, somewhat in the manner made painfully familiar to us by the history of later American monuments to popular heroes, until 1824, when it was revived into new activity by the visit of Lafayette. In October of that year a public meeting of citizens was held, at which a resolution was

passed that a monument be erected to the memory of Washington in this city, and a committee of well known citizens was named.  The powers of this committee which are important to observe, were, in general, " to carry into effect the preceding resolution," and in so doing they were authorized " to fill any vacancies that may occur in their body," to collect subscriptions, to receive designs, *select the place most suitable*, and adopt prompt measures for the execution of the project.  Other resolutions directed the committee to request the corporation of the city of Philadelphia to grant permission for the erection of the monument in Washington Square, and to wait on the standing committee of the Society of the Cincinnati to ascertain if they would co-operate in the undertaking.  Several things are demonstrated by this survey of the origin of the fund. It was put in the charge of a committee who were practically constituted perpetual trustees, by the power to fill vacancies in their own body.  The entire control of the fund, the monument, and its location, was put into the hands of the committee without reserve, for although it was clearly the expectation of the meeting and the subscribers that the monument should be placed in Washington Square, and their desire that the fund should be united with that of the Cincinnati, and the committee was directed to take certain steps in furtherance of those views, yet no pledge or condition was attached to the subscriptions, nothing was made mandatory upon the committee, and its authority over the site as well as over other matters, was left uncontrolled, except that under the main resolution the monument must be erected in Philadelphia.

The fund, thus started, drifted along for a number of years, very much as the preceding one was doing.  Both, however, it should be said, were managed with great intelligence, prudence and care, patriotically without charge, and upon the wise policy of waiting until a monument could be afforded, that would be really worthy of Washington and of the universal desire to do him lasting honor.  In 1853 the treasurer of the fund, Mr. Elihu Chauncey, having died, the surviving members of the committee, as trustees, appointed Mr. Purves treasurer, to receive, and " hold the said moneys . . . . subject to the control and direction of the said surviving members of the said committee, and of such persons who might thereafter succeed law-

fully to the powers and rights of the said surviving members."
It will be seen that the committee still retained and intended
to reserve all its original authority over the whole subject-matter.
Except Mr. Binney, who being a member of the Cincinnati com-
mittee, took the professional view that he ought not to act for
two parties whose interests might possibly diverge, there were in
1853 but two survivors of the original committee, Mr. J. R. In-
gersoll and Mr. Clement C. Biddle, both of whom, as the evi-
dence shows, and as is found as a fact and recited in the decree of
the court below, made June 19, 1880, desired to turn the fund over
to the Cincinnati, to be united with the latter's own fund for the
same purpose.   They could unquestionably have done so with-
out a decree of any court, by filling the vacancies in their own
body by the appointment of the standing committee of the Cin-
cinnati.   That would have been, in fact, only carrying out the
plan of the originators of the fund, expressed in the resolution of
the meeting of 1824.   But the survivors of the committee seem
to have had some reluctance to exercise their power in that re-
gard, after the lapse of so many years, or it may be that the
Cincinnati were not then willing.   Whatever may be the rea-
son, nothing further was done until 1871, when both the sur-
vivors of the committee having died without appointing any
successor, the fund was without a trustee, and on petition of
Mr. Purves, the treasurer, the court appointed the Pennsylva-
nia Company for Insurance on Lives, etc.   The decree, dated
October 20, 1871, simply appoints the Penna. Co., "trustee
of the Washington Monument Fund," with the single condition
that they shall act without compensation.   No modification of
the powers or duties of the trustees was made, and they contin-
ued in the new trustees as they had been in the old.   The right
to fix the site of the monument was clearly among such powers.
No exercise of such right however was undertaken by the
Penna. Co. who seemed to regard themselves rather as success-
ors of Mr. Purves in his office of treasurer, than of Mr. Inger-
soll and Mr. Biddle in their office of trustees,—at least the
company confined their action to the careful management and
increase of the fund.   No further steps were taken until 1880,
when the Society of the Cincinnati, having determined that
the time when they could act had arrived, presented a petition
to the court to have the monument fund turned over to them

in accordance with the desire of the original subscribers, and the intent of the survivors of the committee of 1824.   This petition did not allege any violation of duty by the Pennsylvania Company, or any other ground for its removal as trustee, and would have conferred no jurisdiction on the court for that purpose.   But it was drawn on the view apparently that that company was merely the custodian of the fund, its treasurer, and that view was shared by the company itself, which incorporated in its answer a resignation of its position as trustee.   This opened the way for the action of the court, and the decree recited the fact that the company by its answer assented to a discharge.   The decree was made June 19, 1880, and was that " the State Society of the Cincinnati of Pennsylvania, be appointed trustees," with provision for the entry of security, and the discharge of the former trustees from further liability after paying over the assets, etc.   This was all that was necessary, and the decree might have stopped there.   But ex abundanti cautela, and in accordance with the expectation of all parties apparently at that time, the decree proceeded to recite the intention of the holders of the two funds that they should be united, and to authorize expressly such union, and the application of both by the Cincinnati, to the erection of a monument " upon a suitable spot in the park of the city of Philadelphia." This provision as to the site of the monument was no doubt inserted in accordance with the general expectation at the time. Such expectation is expressed by the Cincinnati themselves, in their petition wherein they set out that " it is proposed that the permission of the park commissioners of the city of Philadelphia be obtained to erect this monument at an appropriate place in Fairmount park."    But it was an expectation only, exactly similar to that embodied in the resolution of the original meeting of 1824, that " the corporation of the city of Philadelphia be requested by the committee to grant permission for the erection of this monument in Washington Square."    That was the site in contemplation in 1824 by contributors and committee alike, but nevertheless the determination of the location was left to the final judgment of the committee.   The designation of the site in the Cincinnati's petition in 1880, was likewise an expression of their then present judgment only, and of no more binding effect.   It had in it no element of pledge or contract.

The control of their own fund was, as it had always been, absolute, and there is nothing whatever to show that they meant to surrender any part of it. As to the monument fund, they were the regularly constituted successors to the original committee, and we have already seen that all the powers of that committee were carefully preserved and transmitted to the successors in the trust. One of such original powers, by the express terms of the trust, was the determination of the site, and the court had no jurisdiction to interfere with the trustees in that respect. No such request was made by the petition or demanded by the circumstances. It was not a case where the court was called upon to exercise its discretion in regard to the administration of the trust, under the cy pres doctrine, or under any general chancery power to control the execution of trusts where literal compliance with the original terms has become impossible. It was the simple and ordinary case of a vacancy in the office of trustee, to be filled by the court under the act of June 14, 1836, sect. 23, P. L. 634, and by the express letter of the statute, as well as by the general principles of law, the new trustee had the same powers and authorities in relation to the trust as their predecessors. It was not competent for the court to impose any conditions upon the new trustee, which would vary the terms of the trust, or limit the powers that it conferred on the trustee. The selection of a site for the monument was committed by the contributors to the fund, to the discretion of the trustees, and their successors, and so much of the order of the court as interferes with the free exercise of such discretion, and assumes to fix the site, was improvidently made and must be rescinded.

It may be well to consider, lest by silence we should be supposed to sanction the objection that the monument cannot be lawfully placed on Independence Square. It is an objection that could only be made by the commonwealth, but would not be tenable if made by her. The title to Independence Square is in the city of Philadelphia in fee simple. The acts of 1735 and 1762 cited in the appellee's brief have no application, for they were superseded by the act of 1816, and for the same reason the cases as to highways are not analogous. Highways are the property of the state, in the care of the city, but subject to the control and direction of the state. By the act of March 11,

1816, P. L. 109, if the corporation of the city of Philadelphia should pay seventy thousand dollars, the governor was authorized and directed "to make a deed in the name of the commonwealth for said state house and square, vesting the title in said corporation in fee simple." This was done, the commonwealth parted with its title, as it would to any other patentee, for a money consideration, and its only right now to interfere with the city's use or disposition of the land, is by virtue of the condition of the conveyance that "no part of said ground, lying to the southward of the state house within the wall as it is now built, be made use of for erecting any sort of buildings thereon, but that the same shall be and remain a public green and walk forever." The commonwealth may enforce this condition, or may release it, as it did partially by section 8 of the act of March 16, 1847, P. L. 471, authorizing the county commissioners of Philadelphia, with the consent of councils, to build a new court house on part of the square. But this is the extent of its rights or control over the square, and it would seem that so much of the act of August 5, 1870, P. L. 1871, p. 1549, creating the building commission, as directs the removal of all the buildings except Independence Hall, is beyond the authority of the legislature, and void. But the proposed monument is not a building within the prohibited condition. A monument may take the shape of a memorial hall or other building, but that is not the general sense of the word and will not be presumed. A statue upon a pedestal, even though the latter be large, is not a building in the popular meaning of the term, and in no proper sense can it be said to interfere with the devotion of the ground to public use as an open green and walk. On the contrary the consensus of art and taste over the civilized world is that the green of public parks is the most appropriate place for national monuments of this kind.

If this construction of the word building were at all doubtful, it would be settled by the terms of the act of 1816 itself. It is entitled "An Act providing for the sale of the state house and State House Square in the City of Philadelphia," and is a sad illustration of the want of reverence for historical and patriotic associations in our people at that time. It directed the governor to appoint three commissioners, neither of whom

should be a resident of Philadelphia, who were to lay out a street or streets through the State House Square, in such manner as would most conduce to the value of the property, to divide the square "into lots suitable for building," and put them up for sale at auction.   This was the kind of buildings that the framers of the act had in contemplation.   The provisions of sect. 7, already quoted, as to the purchase by the city of Philadelphia, were an alternative, to be accepted by the city within a time limited, and only in such case was the division and sale of lots for building to be avoided.   The act apparently regarded the state house itself as old material, for it makes no reservation of it, and in fact only mentions it incidentally, in directing that "the large clock, now remaining within the state house," shall be removed to Harrisburg if the commissioners think it of value enough to warrant the expense, but if not, they are to sell the same, "either separately or *with the house and lot to which the same is attached*."   That is all the description of which the historic state house was thought worthy.   Notably does it illustrate the growth of national and patriotic sentiment, that, while I am writing this review of the act of 1816, the liberty bell, which was not thought worth mention in it, but left to be sold as old lumber with the walls and rafters of Independence Hall, is making a triumphant journey, in a special train with a special guard, to the gathering of nations at Chicago, and at every stopping place, by day or by night, meeting a spontaneous outpouring of love and pride and veneration not accorded to any ruler in the world.   That our people were patriotic they had proved before 1816 by two wars, but their sense of historic veneration was small.   Fortunately it was not altogether wanting in Philadelphia, and the vandalism of the act was averted.   It ought perhaps to be said for the legislators of 1816, that though they had little appreciation of the value and force of historic associations, and the tearing down of the state house did not offend their sense of propriety, yet they were not without public spirit according to their light, for, while the commissioners were directed not to sell lots to purchasers at prices which would aggregate less than one hundred and fifty thousand dollars, the commonwealth was willing to sell to the city for half that sum, with the condition that the square should remain to the people as a public green and walk forever.

In reaching the conclusion that we have, we are not express-
ing any personal preference of our own.  For myself I may
say as a citizen that I believe a much better site can be found
on the knoll of elevated ground at the west end of Girard A-
venue bridge, where a near view of the monument on all sides
could be had from the walks and drives of the West park, and
more distant views from the East park, the bridge, and the
boats on the river, and at least a passing glimpse by the hun-
dreds of thousands of people who travel by rail annually be-
tween Philadelphia and New York.   But individual opinions,
however numerous and however respectable, are of no impor-
tance, and I have gone out of the way to mention my own, solely
to emphasize the fact that the location of the monument is
not, and never was, a matter for the determination of this court
or the court below, but, as a legal right, rests in the discretion
of the Society of the Cincinnati, subject only to the limitation
that it is to be in the city of Philadelphia, and the necessary
condition that if on public property it must be with the consent
of the municipal authorities.

The decree is amended by striking out the words "upon a
suitable spot in the park of the city of Philadelphia," and
thus amended it is affirmed.